**United States District Court**
For the Northern District of California

**\*E-Filed 08/25/2010\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DOUGLAS BURNS,

No. C 08-2995 RS

           Plaintiff,

   v.

CITY OF REDWOOD CITY, et al.,

           Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

On April 1, 2007, plaintiff Douglas Burns had the misfortune of suffering a diabetic emergency in a very public setting.  Several police officers apparently mistook his confused and erratic behavior for symptoms of intoxication and, ultimately, five officers wrestled him forcibly to the ground.  Before the struggle ended with Burns bleeding and in handcuffs, the officers deployed pepper spray, nunchakus and a steel baton.  The officers cited Burns for battery of a police officer and resisting arrest.  An emergency medical technician who arrived at the scene to address any burns or irritation from the spray verified that Burns was in fact suffering from diabetic shock and administered treatment.  This lawsuit arises out of that incident and seeks redress for the injuries Burns sustained.  He advances several claims for relief against the officers in their individual capacities, as well as against Redwood City (the "City") and the Redwood City Police Department

**United States District Court**
For the Northern District of California

(the "Department").  The municipal defendants and individual police officers Jamie Mateo, David Gough and Ramiro Perez move for summary judgment on all plaintiff's claims.[1]  For the reasons stated below, Officer Perez is entitled to summary judgment on all claims asserted against him under both federal and state law.  Burns has not presented any material, disputed facts to support either his *Monell* claim against the municipal defendants or his unlawful arrest claim and these are also resolved at summary judgment in defendants' favor.  All other defense motions for summary judgment are denied.

## II.  RELEVANT FACTS

Douglas Burns is a professional body-builder.  In the spring of 2007, he was forty-six years old, five feet, nine inches tall and weighed somewhere between 192 and 197 pounds.  Sixth months prior to the incident, Burns earned the title "Mr. Natural Universe," which he represents reflects the highest echelon in drug-free men's body building.  Burns also suffers from Type I diabetes, a chronic condition diagnosed at the age of seven.  Burns advocates for diabetes education and is the co-author of *The Diabetes Antidote: An Exercise Prescription to Prevent Type 2, to Combat Type 1.*

Burns depends on insulin injections to regulate his blood sugar.  If blood sugar levels drop below the normal range, any diabetic can experience hypoglycemia, or insulin shock.  Apparently, a non-diabetic who experiences hypoglycemia will sense obvious alarms in response to the body's production of stress hormones.  According to the plaintiff, a long-term sufferer can experience something called "hypoglycemia unawareness," where the body gradually stops producing stress hormones.  In such a case, the person may not become aware of a problem until blood sugar levels plummet to a dangerous level.  Severe symptoms often closely mimic the effects of intoxication by drugs or alcohol.  The basic training required of all police cadets in California lists the following indicators of diabetic emergency: aggressiveness, combativeness, uncooperative behavior, confusion, a dazed appearance, decreased level of consciousness, and impaired motor skills.

---

[1] Officers Steven Sysum and Richard Harrington were named as defendants.  Burns dismissed them from his Complaint in December of 2009.  In his opposition papers, Burns also makes clear that he has voluntarily dropped the malicious prosecution and California Civil Code section 51.7 (the "Ralph Act") claim raised in his Complaint.

**United States District Court**
For the Northern District of California

On the evening of April 7, 2007, Burns planned to catch the 7:00 screening of a film at the Century 20 Theater in Redwood City. In the parking lot, sometime between 6:15 and 6:30, Burns injected insulin into his arm in preparation for the theater popcorn he expected to eat. En route to the ticket counter, Burns bumped into several people he knew (first, a group of teens who knew of and admired his athletic pursuits and asked for training advice and, second, a couple with whom he was friendly) and chatted with each. He testified that by the time he reached the front of the ticket line, his blood sugar had begun to plummet and that he could no longer remember what film he came to see or even clearly read the print listing the available screenings. Eventually, he was able with some prompting to articulate his choice. He purchased a ticket and headed upstairs to the candy counter. By the time he reached the front of that line, he was only able to explain that he needed sugar. His request confused the sales clerk at the counter and she turned him away. Burns then maneuvered toward a soda fountain, where he proceeded to fill a paper cup partially with soda, pour it out, and repeat the process.

A theater employee asked a security guard to check on Burns. The guard, Mikhail Burlyga, testified that when he asked if anything was wrong, Burns did not respond but seemed to sway slightly from side to side. Burlyga assumed Burns was intoxicated and so escorted him down the stairs, returned the seven dollars Burns had paid for his ticket, and led him out the theater's exit doors. Concerned Burns might attempt to drive, Burlyga attracted the attention of a uniformed police officer, Jamie Mateo, standing nearby. At roughly the same time, a second theater employee telephoned the police to report Burns' strange behavior. When the dispatcher asked what Burns had done, the employee replied, "Nothing really. He basically just looks like he's on something. He can barely stand on his own." The dispatcher then alerted local officers that a man was loitering outside the theater. Officer Mateo also received this information via radio.

According to Mateo, Burns was staggering about in circles, counting the loose dollar bills he held in his hands. Mateo also noted something strange about Burns' stride: his steps were quite pronounced and high. As Mateo approached Burns, Mateo distinctly noted that he could *not* smell alcohol on Burns' breath but did think that Burns otherwise appeared to be under the influence of

some sort of substance.  Mateo asked Burns, "Sir, how can I help you?"  He did not directly ask if Burns was ill or in need of medical assistance.  Then, Mateo asserts that Burns unexpectedly "kind of" lunged toward him and uttered an expletive, along with several other incomprehensible phrases.  Plaintiff notes that no mention of the profanity or the lunge appeared in Mateo's police report.

Although the area in front of the theater was crowded with onlookers, no other witness saw Burns lunge toward Mateo or heard him swear.  Mateo avers he "felt threatened by Burns' behavior and hulking physique."  Within a matter of minutes, Sergeant Gough arrived.  Gough also testified that, as he approached the theater, Burns was disoriented, agitated and struggling to stand.  Gough says he levied a series of questions at Burns: "What's the matter?  What's your name?  How can we help you?"  Burns did not answer but instead parroted Gough's questions back to him.  Gough later testified that it crossed his mind Burns might be under the influence of drugs or in the midst of a diabetic or other medical emergency.  He did not, though, ask about Burns' medical needs.  Because Burns' movements appeared generally directed toward the theater's entryway, Gough positioned himself between Burns and the door.  Although the testimony of each officer differs somewhat, they collectively attest that Mateo stood somewhere between five and fifteen feet away from Gough.

According to the officers, Burns walked directly toward Gough, as if in an attempt to reenter the theater.  Although Burns cannot actually remember much of the incident after his blood sugar levels dipped, he speculates that he presumably wanted to return to the area where sugar was available.  Gough held up his hand against Burns' chest and told him to "stop."  Burns then spun around and "high-stepped" confusedly back toward Mateo.  Burns reasons that Gough knocked him off balance.  A witness, David Morgan, told an interviewing officer that "[t]he man stumbled and bumped into a police officer.  Then the officer pepper sprayed the man in the face."  Mateo insists he was forcefully pushed.  Gough testified that Burns shoved Mateo "with both hands" on the officer's chest or shoulder area.[2]  It was then that Mateo sprayed a two to three second stream of

_____

[2] The security guard, Burlyga, also stated in his deposition that he saw Burns push Mateo.  Burns points out, though, that Burlyga never mentioned this fact in the report he wrote after the incident or in his interview with the RCPD.  Apparently, Burlyga had applied for a position with the Department and, after the incident, was in contact with Mateo.  On at least one occasion, Mateo took Burlyga for a "ride-along."  Burlyga denies that the two discussed Burns' case in any detail.  In his

No. C 08-2995 RS
ORDER

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   pepper spray into Burns' face.  Again, Mateo cites Burns' obvious strength, his bizarre behavior,

2   and the fact that the officers had yet to conduct any form of weapons search as justification for the

3   spray.  Burns, who was clearly agitated, gripped his eyes with his palms and continued to walk

4   about in an even more confused manner.  Gough ordered that Burns drop to the ground but he did

5   not respond.  The security guard testified that he heard one of the officers tell Burns he was under

6   arrest.

7       It is not clear exactly how Gough and Mateo physically brought Burns to the ground, but it is

8   at least undisputed that roughly ninety seconds passed between when Mateo first approached Burns

9   and when the officers wrestled him to the ground.  It was the attempt to handcuff Burns that proved

10  problematic.  Gough and Mateo assert that Burns landed on his torso but with his hands folded

11  beneath his waist.  While the officers agree that he never swung his arms or attempted to strike

12  them, they assert that he tensed up his body and limbs and would not submit to handcuffs.  Mateo

13  was positioned on Burns' right side, Gough on his left, and both officers tried to gain control of the

14  closest arm.  Mateo claims Burns at one point locked Mateo's hand in the space between Burns'

15  bicep and his ribcage.  The officer insists this caused him great pain.  As he was not strong enough

16  to yank it free, Mateo used the butt end of his nunchaku tool to strike Burns in the upper shoulder

17  area several times.  Mateo did not discuss the pinned hand or any nunchaku blows in his report.

18      Burns vaguely remembers being thrust onto the pavement and can recall a painful sensation

19  in his shoulder, but otherwise remembers little of the struggle: "I remember snippets of being—I

20  remember my face being on the pavement.  I remember smelling the pavement.  I remember

21  smelling my blood.  I remember being bent over and just locking down . . . ."  He disputes, though,

22  Mateo's theory that he needed to use the nunchaku to free his hand.  Multiple witnesses, including

23  Officer Perez, who had arrived at the scene mid-fracas, testified that Burns' right arm was extended,

24  as if Burns were engaged in a one-armed push up.  Burns argues that, from this position, it would be

25  unlikely that he would be able to maintain any sort of grip on Mateo's hand (or indeed, his entire

26

27  deposition—which occurred after the ride-along—Burlyga mentioned for the first time that,
    although certain other facts were fuzzy, he now distinctly remembered the push.

28
                                                                    No. C 08-2995 RS
                                                                    ORDER

                                      5

1    "arm" as Mateo somewhat inconsistently testified) between his bicep and ribcage.

2         Gough, meanwhile, was similarly engaged on Burns' left side.  Apparently, he yanked and

3    pulled on Burns' arm with such force that he tore and partially ruptured his own bicep.  He states

4    that when he noticed Burns bracing his forehead into the pavement, as if for leverage, he began to

5    fear that Burns might be able to raise himself up off the ground.  With his right hand, Gough drew

6    his collapsible tactical baton from his utility belt.  He did not extend the baton but did deliver three

7    blows to Burns' ribcage.  Defense witness, Pastor Joel Vano, observed part of the struggle and later

8    sought out the department to provide his recollection.  Vano testified that Gough did not raise the

9    baton more than eight inches before striking Burns.  In his opinion, Gough did not deploy "a huge

10   amount of force" to do so.  Pastor Vano also described Burns' resistance as "strenuous."

11        In the midst of this imbroglio, Officer Perez testified that he noticed Burns raise his hips

12   slightly from the ground as Perez pushed his head downward.  Worried that Burns was gaining

13   leverage, Perez positioned himself at Burns' head and wrapped his arms around Burns' right arm

14   and head (plaintiff's papers describe the position as a "half-nelson").  Perez used the strength of his

15   two arms to squeeze Burns' head toward his right bicep.  Officer Sysum arrived soon after and tried

16   to assist by grabbing Burns' legs in something of a bear hug.  Officer Harrington arrived last and

17   endeavored to help control Burns' left arm.  Plaintiff's witness David Morgan stated that he saw at

18   least one of the officers kneel on Burns back and head area to force his face into the pavement.

19   Mateo then wrapped his nunchaku tool around Burns' right wrist and cuffed that hand.  Once both

20   wrists were cuffed, the officers pulled Burns up from the ground, asked him to sit in the doorframe

21   of a squad car, and called for medical assistance to wash away the pepper spray.

22        Before Burns received any medical attention, Mateo questioned him.  Burns' medical

23   witnesses explain that the adrenaline rush Burns experienced elevated his blood sugar levels slightly

24   and explains why he was actually able to confer with and answer Mateo's questions.  Mateo did not

25   recite any *Miranda* warnings but did tape record the conversation.  The transcript reflects that Burns

26   did not seem to recall the struggle.  When Mateo explained to Burns that he had resisted the officers,

27   Burns apologized.  Burns then explained that he is a diabetic and was in need of sugar or

28

1    carbohydrates.  When the medical team arrived, Burns was by that time seated on a planter, still in

2    handcuffs.  Gough warned the medical team that Burns suffers from diabetes.  An EMT, Ian Lee,

3    tested Burns' blood level.  It was 26 mg/dl, or generally indicative (according to Burns' witnesses)

4    of life-threatening diabetic hypoglycemia.  Lee administered oral glucose.  When Lee relayed

5    Burns' blood sugar level to the officers, he testified that they seemed not to comprehend the

6    significance of the precise number.  As he stated, "I think it was kind of dismissed. . . .  I don't

7    believe that the police department is medically trained to understand what a blood sugar of 26 is."

8    Gough then told Mateo to cite Burns for violating California Penal Code sections 243(b) and

9    148: respectively, battery of a police officer and resisting arrest.  Gough did so after he knew of

10   Burns' medical condition.  Burns suggests the officer's knowledge of his condition made issuance

11   of the citations legally unsupportable.  Gough and Mateo counter that determining whether a suspect

12   has the requisite mental capacity to commit these offenses is a prosecutor's rather than a police

13   officer's role.  The county prosecutor dropped all charges within two months.

14   On the evening in question, Burns wore denim jeans and a red, long-sleeved Adidas brand

15   pullover.  In photographs taken at the scene and according to witness testimony, Burns' sleeves

16   were rolled up to the elbows.  Burns also claims he religiously wore a medical alert bracelet on his

17   left wrist.  He insists it was on his arm that night.  The bracelet is heavy, metallic and designed for

18   ready visibility.  The words "MEDIC ALERT" are inscribed into its front in large red font and

19   "DIABETES – TAKES INSULIN – DOUGLAS CHRISTOPHER BURNS" is written across the

20   bracelet's back.  Although Burns cannot remember how it came to be there, someone at the scene

21   apparently discovered the bracelet in Burns' pocket after the scuffle.  The clasp was bent; Burns

22   reasons that the bent clasp at least raises the inference that the bracelet came off in the struggle.  All

23   officers deny seeing the bracelet on his wrist.

24   As part of the requisite training at the police academy, all officers involved were trained to

25   identify and handle a diabetic emergency.  The Police Officer Standards and Training ("POST")

26   handbook lists common indicators of insulin shock and points out that they "are similar to

27   indications of alcohol intoxication or substance abuse."  The handbook then expressly warns that an

28

United States District Court
For the Northern District of California

officer should "never assume that a person exhibiting these indicators is intoxicated without further questioning or assessment." Former and current Redwood City Chiefs of Police, Carlos Bolanos and Louis Cobarruviaz, agree that POST sets generally established standards for law enforcement officers in California. Although the officers all agreed that they were duly trained at their respective academies, they could not recall extensive significant, subsequent training. They do note that they participated in First Aid training through the Department. As part of this training, the officers recall viewing a video that addressed diabetic emergencies. Following the incident with Burns, however, the department did devote several training sessions exclusively to the issue of just such emergencies.

Following the incident, Burns was transported to the San Mateo Medical Center Emergency Room. He received further treatment for hypoglycemia. Burns also sustained a brachial plexus tear which continues to bother him; bruising to the top of his head, nose, and the right side of his head; a blood bruise to the trapezius area of his right shoulder; a bruise on his left back rib area slightly larger than a silver dollar; scuffmarks on his hands, red lines around both wrists from either the handcuffs or the nunchakus; and abrasions on his face. Burns contends that the brachial plexus tear continues to plague him; he reports lingering numbness, tingling and weakness. His treating physician, Dr. Greenwald, has indicated that he does not expect that Burns will fully recover. Burns contends the brachial plexus injury has effectively curtailed his body building career.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law

**United States District Court**
For the Northern District of California

1  when the non-moving party fails to make a sufficient showing on an essential element of the case

2  with respect to which he bears the burden of proof at trial. *Id.* at 322-23.

3  The non-moving party "must set forth specific facts showing that there is a genuine issue for

4  trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly

5  supported motion for summary judgment simply by alleging some factual dispute between the

6  parties. To preclude the entry of summary judgment, the non-moving party must bring forth

7  material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . .

8  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,*

9  *Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there

10  is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*,

11  475 U.S. 574, 588 (1986).

12  The court must draw all reasonable inferences in favor of the non-moving party, including

13  questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker*

14  *Magazine, Inc.*, 501 U.S. 496 (1991) (*citing Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at

15  588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the

16  nonmoving party, coupled with undisputed background or contextual facts, are such that a rational

17  or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v.*

18  *Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if

19  the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury

20  could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the

21  record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

22  is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

23  IV. DISCUSSION

24  A.  Section 1983 Claim Against Individual Officers and Qualified Immunity

25  Burns alleges that Mateo, Gough and Perez employed excessive force in violation of his

26  Fourth and Fourteenth Amendment right to be free from unreasonable search and seizure. Burns

27  grounds this claim on section 1983 of the Civil Rights Act. That section provides, in relevant part,

28

No. C 08-2995 RS
ORDER

9

that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Title 42 U.S.C. § 1983.  The defendants deny that Burns has raised a triable issue of fact to support the excessive force claim and also raise a defense of qualified immunity.  Resolution of the motion involves two questions: whether the force used was excessive, and, if so, whether the three police officers are nevertheless entitled to qualified immunity either because the law was not clearly established or because the officers made an objectively reasonable error in judgment.

The Supreme Court recently reexamined and refined the manner in which district courts are to proceed when, in an excessive force case brought under section 1983, government officials assert a qualified immunity defense.  *See Pearson v. Callahan*, 129 S. Ct. 808 (2009).  Under the framework previously set forth in *Saucier v. Katz*, a district court was required to determine as a threshold matter whether the plaintiff had shown the deprivation of a constitutional right.  533 U.S. 194, 205 (2001).  If so, the court would then analyze whether the right violated was clearly established in a "particularized . . . sense: . . . the relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201.  In *Pearson*, the Court dropped *Saucier*'s requirement that district courts adhere to the two-step sequence, especially where the "order of battle" framework required district courts to grapple with difficult questions of constitutional law even where resolution of the second prong would prove determinative.  As the *Pearson* Court recognized, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 129 S. Ct. at 818.

1. <u>Excessive Force</u>

A claim that a police officer employed excessive force implicates the Fourth Amendment's

prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Accordingly, a police officer's actions are measured by a standard of objective reasonableness. *Id.* at 397. The reasonableness of the force used to effect a particular seizure, in turn, is determined by "careful[ly] balancing . . . 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (*quoting Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). More simply, "[t]he force which [i]s applied must be balanced against the need for that force." *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). *See also Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994). The strength of the governmental interests depends on the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Graham*, 490 U.S. at 396. It is also important to appreciate that police officers "are often forced to make split-second judgments," and that therefore "not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers" is a violation of the Fourth Amendment. *Id.* (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). It is equally true, though, that even where some force is justified, the amount actually used may be excessive. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (*citing P.B. v. Koch*, 96 F.3d 1298, 1303-04 (9th Cir. 1996)).

The Ninth Circuit has emphasized that the balancing test just described "requires careful attention to the facts and circumstances of each particular case . . . ." *Santos*, 287 F.3d at 853 (*quoting Graham*, 490 U.S. at 396). *See also Deorle v. Rutherford*, 272 F.3d 1272, 1279-81 (9th Cir. 2001). Because an excessive force claim "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has also instructed that summary judgment in excessive force cases should be granted sparingly. *Santos*, 287 F.3d at 853 (*citing Liston*, 120 F.3d at 976 n.10). "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Id.*

Here, a key disputed fact implicates the degree of threat Burns' posed: a witness not associated with either party states that Burns merely stumbled and bumped into Mateo while the

United States District Court
For the Northern District of California

1    officers insist Burns aggressively attacked him.  Construing disputed facts in a light most favorable

2    to Burns, as the Court must on defendants' motion, a reasonable jury could find that the degree of

3    force employed was excessive in light of the corresponding governmental interests at stake.  To the

4    extent Burns suggests that *no* amount of force can ever be reasonably levied against a mentally ill or

5    incompetent person who poses a risk of harm to himself or to others, he is in error.  On the other

6    hand, Burns has raised a triable issue of fact as to whether the degree of force used *here* was

7    excessive as juxtaposed with the level of threat presented.

8           First, the intrusion on Burns' liberty was by no means insubstantial.  Mateo deployed pepper

9    spray into Burns' face at close range for several seconds.  Gough and Mateo then tackled him to the

10   pavement.  In the struggle to handcuff him, Burns sustained Mateo's nunchaku and Gough's baton

11   blows and a torn brachial plexus from either Perez' half-nelson hold or some combination of the

12   above.  Burns' physician, Dr. Greenwald, testified that Burns' brachial plexus may never fully heal

13   and will likely continue to cause pain and discomfort.

14          Next, the underlying "crimes" were not severe.  The officers suspected Burns was

15   intoxicated in public and ultimately cited him for battery of an officer and resisting arrest.  In

16   defendants' motion, they assert that Mateo deployed the pepper spray in response to Burns' sudden

17   attack, the failed prior verbal commands, and the fact that Burns had not yet been checked for

18   weapons.  Burns insists he did not attack Mateo at all but was instead out of balance causing him to

19   tumble into the officer.  There is no evidence that Mateo gave *any* verbal command (he asserts

20   instead that he asked general welfare questions) and no indication in the record that Burns was

21   armed.  Mateo did not instruct Burns to step aside or calm down and he gave no warning that a

22   failure to do so would result in pepper spray.  *Cf. Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th

23   Cir. 2001) (finding officer's use of beanbag shot against unarmed suspect could be unreasonable

24   where there was no indication that he considered less extreme tactics or that he warned the suspect

25   before firing).  Burns is a strong man and, presumably, the receiving end of his out-of-balance

26   stumble could be unpleasant and even intimidating.  Mateo does insist he felt this way.  Even so, "a

27   simple statement by an officer that he fears for his safety or the safety of others," the Ninth Circuit

28

No. C 08-2995 RS
ORDER

12

1   has instructed, "is not enough . . . ."  *Deorle*, 272 F.3d at 1281.  "[T]here must be objective factors

2   to justify such a concern."  *Id.*

3        Moreover, the officers admit they suspected Burns was intoxicated or mentally ill.  They

4   repeatedly use the term "psychotic" incident or episode to describe his behavior.  Burns argues that,

5   in light of their POST training on diabetic emergencies and the prominent medic alert bracelet he

6   insists he wore that night, it also should have occurred to them that he was suffering from diabetic

7   shock.  Indeed, Gough in his deposition highlights how the possibility of a diabetic emergency

8   crossed his mind.  Burns' correctly suggests that the condition itself has a role to play in the

9   reasonableness inquiry.  In *Deorle*, the Ninth Circuit emphasized that a suspect's apparent mental

10  incapacity should inform the officer's approach:

12          The problems posed by, and thus the tactics to be employed against, an unarmed,
            emotionally distraught individual who is creating a disturbance or resisting arrest
13          are ordinarily different from those involved in law enforcement efforts to subdue
            an armed and dangerous criminal who has recently committed a serious offense.
14          In the former instance, increasing the use of force may, in some circumstances at
            least, exacerbate the situation . . . .  We do not adopt a per se rule establishing two
15          different classifications of suspects . . . [but] we emphasize that where it is or
            should be apparent to the officers that the individual involved is emotionally
16          disturbed, that is a factor that must be considered in determining, under *Graham*,
17          the reasonableness of the force employed.

18  *Deorle*, 272 F.3d at 1282-83.  *See also Bryan v. MacPherson*, 608 F.3d 614, 626 (9th Cir.

19  2010) (emphasizing that *Deorle*'s analysis applies to intermediate levels of force and finding that

20  the tasing of a mentally ill suspect without attempting less intrusive means could constitute

21  unreasonable force).  *See also McAllister v. Price*, No. 10-1213, 2010 WL 3169326, at *14-16 (7th

22  Cir. Aug. 16, 2010) (finding that officer unreasonably "leapt" to conclusion that convulsing, semi-

23  conscious driver in the midst of diabetic shock was intoxicated and, as a result, force employed to

24  throw driver from vehicle and onto pavement was excessive).

25        Drawing all factual inferences as required at this juncture in Burns' favor, a reasonable jury

26  could infer that Burns did not pose an immediate threat of harm to the officers, the theater patrons,

27  or to himself.  The fact that only ninety seconds passed between the initial encounter and when

28

No. C 08-2995 RS
ORDER

*United States District Court*
For the Northern District of California

13

United States District Court

For the Northern District of California

Mateo deployed the pepper spray may suggest the officers lacked time to assess Burns' medical needs but it could also indicate that the pepper spray was a premature and objectively unreasonable response.

By any account, though, Burns resisted the officers' attempt to restrain him after the take-down and the escalation of force employed (nunchakus, a baton, and the half-nelson grip) corresponds to Burns' continued resistance.  There is no evidence that the officers continued to beat or struggle with Burns once he was handcuffed.  Burns disputes that his resistance justified the nunchakus (Burns reasons that Mateo's claim that his hand was pinned is unsupported by the facts), the baton (Burns' expert suggests releasing one hand from the struggle to deploy the baton was tactically unsupportable), and the half-nelson grip (again, the expert contends this grip was ill-advised and ineffective).  Yet, even assuming the officers' force was commensurate with Burns' actions, the plaintiff argues the officers cannot invoke this later resistance as a defense where it was provoked by an earlier (alleged) constitutional violation.

The Ninth Circuit's analysis in *Billington v. Smith* is particularly instructive here.  292 F.3d 1177 (9th Cir. 2002).  The Court carefully reviewed circuit precedent defining the scope of liability where an officer's ultimate use of force was objectively reasonable but followed on the heels of a prior, unreasonable intrusion.  *Billington* reiterated that, "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."  *Id.* at 1189.  On the other hand, "the fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself."  *Id.* at 1190.  This is because "[t]he Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable care' under tort law, and negligent acts do not incur constitutional liability."  *Id.*  "An officer may fail to exercise 'reasonable care' as a matter of tort law yet still be a constitutionally 'reasonable' officer."  *Id.*  But if an officer's provocative actions are objectively unreasonable under the Fourth Amendment, liability is established, and the question becomes the scope of liability, or what harms the constitutional violation proximately caused.  *Id.*

No. C 08-2995 RS
ORDER

14

United States District Court

For the Northern District of California

As explained above, there are genuine issues of fact as to whether the pepper spray and the take-down were constitutionally reasonable. Drawing all inferences in Burns' favor, it follows that this initial aggression "provoked" and proximately caused the blows and trauma that came of the struggle to handcuff Burns (including those inflicted by the other responding officers). Taking as true Burns' assertion that Mateo never asked him to calm down or to step back or warned him before the spray and tackle, a reasonable jury could also find that Mateo acted either intentionally or recklessly. It is clear Burns resisted and that force was necessary to subdue him. Yet, if it was unreasonable to pepper spray and tackle a disturbed man for his failure to answer welfare questions and for stumbling, the officers should not be excused for the blows that followed seconds later when he resisted handcuffs. To be clear, Burns has raised a triable issue of fact as to whether the spray and take-down were constitutionally excessive, given the degree of threat Burns presented. Similarly, there is a material question of fact as to whether such a violation "provoked" Burns' resistance. Mateo and Gough's motion for judgment as a matter of law, therefore, cannot be granted.

This analysis, however, does not so easily apply to Officer Perez, who was not involved or even present during the initial encounter with Burns. When Perez arrived, his fellow officers were already in the midst of a struggle to handcuff a suspect, and they were not having an easy time of it. Perez pulled Burns' head and neck toward his bicep to cause pain, it is true, but he states that he held the position only until Burns was handcuffed. Burns' expert testified that a half-nelson grip is always unnecessarily painful and ineffective. Other than this testimony, however, Burns provides no further evidence or explanation of how or why the technique is excessive in and of itself. Usually, a plaintiff must do more than present an expert's opinion that a particular tactic is per se unreasonable (otherwise, testimony of plaintiff's expert would always decide the constitutional question). *See Billington*, 292 F.3d at 1188 ("[E]ven for summary judgment purposes, the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable.") (citation and internal quotation marks omitted). In contrast, courts in this Circuit have frequently recognized that a pain control grip or device can be employed to subdue a struggling suspect. *See,*

*e.g.*, *Brooks v. City of Seattle*, 599 F.3d 1018, 1026 (9th Cir. 2006) (discussing how hair control grip or stun-level tasing may be appropriately deployed to control a suspect who refused to exit vehicle following traffic stop).  Without more, the expert's admonition of Perez's technique is not sufficient evidence that the half-nelson grip was an unconstitutionally excessive response to Burns' resistance. Accordingly, plaintiff fails to point to any facts, disputed or otherwise, in support of the claim that Officer Perez employed constitutionally excessive force in confronting Burns.

2.  Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  *Id.* at 814.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.  *See Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").  In other words, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Id.*

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted).  The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery."  *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987).

1    Accordingly, the Supreme Court has repeatedly stressed the "importance of resolving immunity

2    questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

3         In short, the qualified immunity doctrine protects an officer's reasonable mistake as to what

4    the law requires.  At least as to the pepper spray and take-down, the state of the law is well-

5    established here in several respects.  Most obviously, *Graham* instructs that an officer's degree of

6    force must correspond to the perceived threat.  Any reasonable officer should know that a "stumble

7    and bump" is not the same thing as an "attack," especially if it is assumed that Burns never swore,

8    lunged toward, or pushed Mateo.  *Deorle* and its progeny also establish that apparent mental illness

9    or incapacity often require tactics different from those designed for criminal suspects.  Under the

10   facts advanced by the plaintiff, Burns' obvious confusion and distress should have alerted Mateo

11   and Burns to the possibility that pepper spray and a tackle might exacerbate, not ameliorate, the

12   situation.  Finally, *Billington* stands for the proposition that an unconstitutional provocation may

13   create liability for subsequent, but reasonable acts of force causally connected to the provocation.

14   The most recent of these cases, *Billington*, was decided eight years ago and all three continue to be

15   cited favorably in this circuit and this district.

16        That said, Mateo and Gough insist that they made a reasonable mistake of *fact* as to the level

17   of threat presented.  Just as the question of whether a constitutional violation occurred here turns

18   entirely on whose facts to accept, so too does the question of immunity.  More simply, if Burns

19   behaved as the officers contend, their mistake of fact might be objectively reasonable.  If he did not,

20   the mistake may be deemed unreasonable.

21        The same cannot be said against Officer Perez's qualified immunity defense.  As noted

22   above, the record is devoid of any facts reflecting a constitutional violation by Perez.  Yet, even if

23   such could be identified, the undisputed facts demonstrate that Perez is entitled to qualified

24   immunity.  Multiple witnesses testified that Burns would not willingly submit to handcuffs.[3]  The

25   undisputed record certainly demonstrates that when Perez arrived on the scene, Mateo and Gough

26   _____

27   [3] Even if he never swung at or kicked the officers, the plaintiff's characterization of his conduct after
     the take-down as "passive resistance" is not supported by any other witness.  Especially as Burns

28   cannot *remember* much of the struggle, this characterization carries limited weight.

No. C 08-2995 RS
ORDER

appeared to be struggling with a combative arrestee.  In light of Burns' apparent strength and the

physical positioning of the other officers, Perez explains he thought it made sense to focus on

Burns' head and shoulder area.  Given Perez' knowledge and Burns' resistance, there is no question

that *some* force to subdue him was constitutionally appropriate.  Burns does not disagree but argues

the half-nelson itself was excessive.  Plaintiff presents no case, and the Court is aware of none, that

establishes the inappropriateness of the grip.  To the contrary, at least one court in this district has

recognized (although not in the qualified immunity context) that an officer's use of a *full* nelson

choke grip was likely not excessive.  *See Redmond v. San Francisco Police Dep't*, No. 07-4276,

2010 WL 2573978, at *4 (N.D. Cal. June 25, 2010) (recognizing that officer's "full-nelson sleeper

grip" was not necessarily excessive where suspect attempted to swallow contraband).  As detailed in

the prior segment, courts also often uphold as reasonable various pain control grips deployed against

resisting suspects.  Even assuming Perez's conduct was constitutionally infirm, the law making it so

was not settled and his mistake would have been a reasonable one.  Officer Perez is therefore

immune from liability.[4]

B. *Monell* Liability

    The municipal defendants move for judgment as a matter of law on Burns' *Monell* claim.  In

*Monell v. New York City Department of Social Services*, the Supreme Court held that a municipality

can be found liable under section 1983 only where the municipality itself causes the constitutional

violation.  436 U.S. 658 (1978).  Respondeat superior or vicarious liability does not attach under

section 1983.  *Id.* at 694-95.  "It is only when the execution of the government's policy or custom . .

. inflicts the injury that the municipality may be held liable under [section] 1983."  *City of Canton,*

*Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citation and internal quotation marks omitted).  The

Ninth Circuit has also established that "a local governmental body may be liable if it has a policy of

*inaction* and such inaction amounts to a failure to protect constitutional rights."  *Mortimer v. Baca*,

---

[4] As reflected in *Billington*, otherwise reasonable force may still result in compensable injury where
the initial law enforcement encounter does not pass constitutional muster.  Accordingly, an issue of
fact remains as to whether Officers Mateo and Gough are responsible for any injury incurred by
Burns as a result of the actions of Perez.

594 F.3d 714, 716 (9th Cir. 2010) (*citing Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)).

Specifically, a municipality may be held liable for inadequate training of police officers if the failure

to train amounts to "deliberate indifference" to the constitutional rights of persons with whom its

officers may come into contact. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 124 (1992);

*City of Canton*, 489 U.S. at 388-89.  As the Supreme Court explained in *City of Canton*, "it may

happen that in light of the duties assigned to specific officers or employees the need for more or

different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been

deliberately indifferent to the need."  489 U.S. at 390.  "In that event, the failure to provide proper

training may fairly be said to represent a policy for which the city is responsible, and for which the

city may be held liable if it actually causes injury." *Id.*

The Court in *City of Canton* further explained that, "the focus must be on adequacy of the

training program in relation to the tasks the particular officers must perform."  *Id.* at 390.  "That a

particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city,

for the officer's shortcomings may have resulted from factors other than a faulty training program."

*Id.* at 390-91 (*citing Springfield v. Kibbe*, 480 U.S. 257, 268 (1987); *City of Oklahoma City v. Tuttle*,

471 U.S. 808, 821 (1985)).  "Neither will it suffice to prove that an injury or accident could have

been avoided if an officer had had better or more training, sufficient to equip him to avoid the

particular injury-causing conduct," as "[s]uch a claim could be made about almost any encounter

resulting in injury, yet not condemn the adequacy of the program to enable officers to respond

properly to the usual and recurring situations with which they must deal."  *Id.* at 391.  Finally, "for

liability to attach . . . the identified deficiency in a city's training program must be closely related to

the ultimate injury." *Id.*  This means that, here, Burns must present evidence that the deficiency in

training caused the police officers' unreasonable force.

Unlike the question of the reasonableness of the force employed by the individual officers,

the facts relating to officer training are not in dispute.  The parties agree that diabetes is a fairly

common disease in the United States; the municipal defendants point out that their officers have

United States District Court

For the Northern District of California

handled diabetic emergencies in the past without incident.  Burns acknowledges that the officers did receive POST training specifically related to such emergencies in their respective academies (in particular, the officers were told never to assume a suspect exhibiting symptoms of intoxication is not actually in the midst of insulin shock), but points out that the Department lacks any written policies or guidelines on handling diabetic emergencies.  The Department counters that its officers *do* receive periodic first aid training, even if the Department has never codified such guidelines in writing.  Specifically, the officers in this case testified that part of this training involves a brief video that discusses the care of citizens in diabetic shock.

Accordingly, undisputed evidence reveals that the officers here *were* trained that the symptoms of diabetic shock mirror those of intoxication, that they should be alert to medic-alert jewelry and that a sufferer may not appreciate the wrongfulness of his or her conduct.  Here, the municipal defendants argue that the situation escalated rapidly and that there was no time for the more fulsome assessment envisioned in the officers' training, that those officers did ask welfare questions, that Burns might have been dangerous even if he was incapacitated, that those officer did not see an alert bracelet, and that even if they did not appreciate the legal meaning of his precise blood sugar level, they routed him to prompt medical care.  Certainly, there may be a question of fact as to whether the officers *followed* their training in all meaningful respects.  The very fact that Burns can measure their behavior against a fairly concrete list of requirements imbued at some point in their training suggests, however, that the department was not "indifferent" to the need for training here.  The municipal defendants' motion for judgment as a matter of law on Burns' *Monell* claim must therefore be granted.[5]

C.  California Bane Civil Rights Act Claim

California Civil Code section 52.1 establishes a claim for relief "against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law."  *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 331

---

[5] Burns acknowledged at oral argument that his plea for injunctive relief was designed to accompany his *Monell* claim.  Accordingly, the defendants' motion is granted as to Burns' injunctive relief plea as well.

United States District Court

For the Northern District of California

1   (1998).  Burns relies on the same excessive force argument detailed above to support this claim.

2   Because the federal claim has survived Gough and Mateo's motion, so too must the state claim

3   survive.  Unlike under the federal counterpart, the municipal defendants may be held vicariously

4   liable for an officer's violation of section 52.1.  Cal. Gov't Code § 815.2(a).  As the City and

5   Department advance no arguments and present no evidence to indicate that Burns is precluded from

6   recovering under this theory, their motion for summary judgment is denied.[6]

7       D.  False Arrest

8       The defendants further seek summary judgment on Burns' false arrest claim.  Although it is

9   not entirely clear from his Complaint, it seems that Burns grounds this claim under both section

10  1983 and state law.  Burns argues that the officers lacked probable cause to arrest him, not at the

11  time of the initial seizure, but when Mateo issued the two citations.

12      A warrantless arrest of an individual in a public place for a crime committed in an officer's

13  presence violates the Fourth Amendment if the arrest is not supported by probable cause.  *See, e.g.*,

14  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  Probable cause to arrest exists when

15  officers have knowledge or reasonably trustworthy information sufficient to lead a person of

16  reasonable caution to believe that an offense has been or is being committed by the person being

17  arrested.  *Beck v.* Ohio, 379 U.S. 89, 91 (1964).  The Ninth Circuit has also defined probable cause

18  as follows: "when, under the totality of the circumstances known to the arresting officers, a prudent

19  person would have concluded that there was a fair probability that an individual has committed a

20  crime."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007); *Gasho v. United States*, 39

21  F.3d 1420, 1428 (9th Cir. 1994).  While conclusive evidence of guilt is of course not necessary

22  under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong

23  reason to suspect are not enough."  *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (*citing*

24  *Henry v. United States*, 361 U.S. 98, 101 (1959)).  Moreover, an arrest without probable cause is

25  always an unreasonable seizure.  *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984).

26
27  [6] For the same reasons discussed above regarding the absence of any basis to proceed against
    Officer Perez on Burns' federal claims, plaintiff's state law claims against that officer are subject to
    summary judgment.

28
                                                                    No. C 08-2995 RS
                                                                    ORDER

**United States District Court**
For the Northern District of California

The officers insist that probable cause warranted the initial seizure.  Although Burns argues the force deployed in the process was unreasonable, this does not mean the officers lacked probable caused to arrest him, at the very least, for public intoxication.  *See* Cal. Penal Code § 647(f).  Burns' unlawful arrest claim focuses instead on the two citations Gough ultimately issued.  These were for battery of an officer and resisting arrest.  At the time Gough instructed Mateo to issue them, Gough was at least aware of Burns' medical condition.  Burns argues it should have been obvious to the officers that his mental incapacity created a legal defense to these crimes.  Accordingly, he contends probable cause no longer existed and that the citations were legally unsupportable.

In response, Burns advances a theory of "continuing arrest," and relies on the Ninth Circuit's "dissipating probable cause" analysis from *United States v. Lopez*.  482 F.3d at 1072-74.  There, the Court recognized that, "[i]n some instances there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime."  *Id.* at 1073.  "In such cases, execution of the arrest or continuation of the arrest is illegal."  *Id.* (*citing United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated."); *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.")).  More simply, Burns suggests that once Gough knew of his medical condition, probable cause dissipated and he should have been released, not cited.

Defendants argue that this is essentially what happened.  First, they point out that Burns was no longer "seized" for purposes of the constitutional inquiry when the citations were issued.  *See United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) ("A seizure occurs when a law enforcement officer through coercion, physical force or a show of authority, in some way restricts the liberty of a person.") (internal quotation marks omitted).  The officers removed the handcuffs so that Burns could receive medical treatment and did not detain him further.  At the time Mateo wrote the citations, Burns was in the midst of receiving medical care.  He was taken to the hospital, not the

No. C 08-2995 RS
ORDER

United States District Court

For the Northern District of California

1   police station, and he was free to leave.  At the time the citations were issued, defendants insist, the

2   arrest was over.  *See, e.g.*, *White v. City of Laguna Beach*, 352 F. Supp. 2d 1143, 1155 (C.D. Cal.

3   2010) ("[T]he mere issuance of a citation does not even constitute a seizure let alone a formal

4   arrest.").  Moreover, all charges against Burns were later dropped.

5       Defendants' analysis is more apt.  At the time Mateo issued the citations, Burns was no

6   longer under arrest.  As the undisputed facts reflect that probable cause supported the initial seizure,

7   defendants' motion for judgment as a matter of law as to the unlawful arrest claim must be granted.

8       E.   Negligence, Intentional Infliction of Emotional Distress, Battery Claims

9       All defendants seek summary judgment on Burns' claims of negligence, intentional

10  infliction of emotional distress and battery.  As against the officers, these claims all focus on the

11  physical force deployed.  Burns relies on a theory of respondeat superior to tie his emotional distress

12  and battery claims to the municipal defendants.  As against them, Burns contends that the City and

13  Department's alleged failure to train the officers as well as their tolerance for unlawful conduct

14  constituted actionable negligence.

15      Defendants' motion relies solely on an immunity defense.  They suggest that section 835a of

16  the California Penal Code as well as sections 820.2 and 815.2 of the California Government Code

17  create immunity from suit where officers act reasonably and within the provisions of the state and

18  federal constitution.  Section 835a provides that "[a] peace officer who makes or attempts to make

19  an arrest need not retreat . . . nor shall such officer be deemed an aggressor or lose his right to self-

20  defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome

21  resistance."  Section 820.2 employs similar language and hails from the California Tort Claims Act.

22  That provision privileges police officers' discretionary decisions made during arrests.  *See*

23  *Blankenhorn v. City of Orange*, 485 F.3d 463, 487-88 (9th Cir. 2007) (*citing Price v. County of San*

24  *Diego*, 990 F. Supp. 1230, 1244 (S.D. Cal. 1998); *Martinez v. County of Los Angeles*, 47 Cal. App.

25  4th 334, 349 (1996)).

26      These provisions plainly do *not* apply, however, to officers who use *unreasonable* force in

27  effecting an arrest.  *See id.* (*citing Scruggs v. Haynes*, 252 Cal. App. 2d 256, 262 (1967) ("[A] peace

28

NO. C 08-2995 RS
ORDER

United States District Court

For the Northern District of California

officer making an arrest is liable to the person arrested for using unreasonable force."); *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002)).  Notably, the Ninth Circuit in *Blackenhorn* rejected a defendant's request for summary judgment on an emotional distress claim where material facts could support a finding of excessive force.  *Id.* at 487 n.17.  The Court reasoned that excessive force could qualify as the elemental requirement of "outrageous" conduct.  Because there is a question of material fact as to whether the use of force employed by Officers Gough and Mateo was objectively reasonable, their argument is unpersuasive.  Those officers' motion for judgment as a matter of law on the negligence, battery and emotional distress claims must be denied.

The municipal defendants cite to section 815.2 of the California Government Code for their immunity argument.  That section provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  Cal. Gov't Code § 815.2(a).  This provision clearly allows for vicarious liability of a public entity when one of its police officers uses excessive force in making an arrest.  *Blackenhorn*, 485 F.3d at 488 (*citing Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 215 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.")).  Neither the City nor the Department argues that the arresting officers were acting outside the scope of their duties.  Because the arresting officers are not entitled to summary judgment on the use of unreasonable force, neither are the municipal defendants entitled to immunity from liability under Government Code section 815.2.  All defense motions for judgment as a matter of law on these claims must therefore be denied.

### V.  Conclusion

Construing the facts and drawing inferences in a light most favorable to Burns, a reasonable jury could find that Officers Mateo and Gough used excessive force in response to the threat Burns posed.  Under the facts Burns presents, moreover, material disputes remain regarding whether the officers made an objectively reasonable mistake of law or fact such that qualified immunity cannot

No. C 08-2995 RS
ORDER

operate as a defense, at least at this procedural phase.  Officer Mateo and Gough's motion for summary judgment of all claims—state and federal—that assume a constitutional violation involving excessive force or assert an immunity defense must be denied.  Officer Perez's conduct, in contrast, did not operate as a constitutional violation and, in any case, he has demonstrated that he may assert qualified immunity.  Perez' motion is granted as to all claims, grounded on either federal or state law, advanced against him.  Finally, the officers' motion for summary judgment on Burns' false arrest claim must be granted.

The municipality's motion for summary judgment on Burns' *Monell* claim similarly must be granted.  As Burns' plea for injunctive relief assumed a *Monell* violation, this plea must be denied as well.  Insofar as the municipal defendants may be held vicariously liable for the officers' conduct under state law, it remains a party in this action to the extent of those claims.

IT IS SO ORDERED.

Dated: 08/25/2010

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

No. C 08-2995 RS
ORDER

25